IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHIEF HENRY V. TOBIN III,            :
                                     :
            Plaintiff,               :
                                     :    C.A. No. 04-1211 ***
            v.                       :
                                     :
THOMAS P. GORDON, individually:
and in his official capacity; :
SHERRY FREEBERY, individually :
and in her official capacity; :
COLONEL JOHN L. CUNNINGHAM,   :
RETIRED, individually;        :
COLONEL DAVID F. MCALLISTER,  :
individually and in his       :
official capacity; and        :
NEW CASTLE COUNTY,            :    TRIAL BY JURY DEMANDED
a municipal corporation,      :
                                     :
            Defendants.              :

### FIRST AMENDED COMPLAINT[1]

1.  Plaintiff reported to federal prosecutors, law
enforcement officials and the grand jury alleged wrongdoing in
November 2001 by defendant Freebery who abused her authority to

---

[1] Pursuant to Rule 15(a) of the Federal Rules of Civil
Procedure, because defendants have filed no responsive pleadings,
plaintiff amends his Complaint as a matter of right. See
Centifanti v. Nix, 865 F.2d 1422, 1431 n.9 (3d Cir. 1989); Albany
Ins. Co. v. Almacenadora Somex, S.A., 5 F.3d 907, 910-11 (5th
Cir. 1993). As amended, the Complaint now incorporates the facts
underlying the related criminal guilty pleas of several
defendants and key witnesses that occurred since the case was
stayed nearly three years ago. Specifically, amendments have
been made to the caption, ¶¶ 1, 3, 4, 5, 6, 7, 9, 10, 11, 13, 15,
16, 20, 23, 25, 55, 65, 73, 84, 85, 116.C and D, 120, 121, 143,
146, and § III.D.(1). Also, ¶¶ 16.a, b, c, d, e, and f, and 65.a
have been added, and the Wherefore Clause has been revised.

protect her son from an ongoing criminal investigation into a
hit-and-run motor vehicle offense.  He also reported that while
she was County Police Chief defendant Freebery shut down the
Police Department's entire Detective Division for a full work day
and forced a majority of detectives while on duty to campaign in
1996 for State Senator Thomas Sharp and for defendant Gordon who
was campaigning for election to County Executive.  As a result
plaintiff three times has been denied promotion to the rank of
police Captain.  Consequently, he files this civil action for
compensatory and punitive damages and injunctive relief for
retaliatory violations of the free speech and petition clauses of
the First Amendment of the United States Constitution.

## I.   JURISDICTION AND VENUE

2.   The jurisdiction of this Court is invoked pursuant to 28
U.S.C. §§ 1331 and 1343(a)(3) and (4), 28 U.S.C. §§ 2201 and
2202, and the First and Fourteenth Amendments to the U.S.
Constitution.  The cause of action arises under 42 U.S.C. § 1983.
The claim arose in this judicial district.

## II.   THE PARTIES

3.   Plaintiff Chief Henry V. Tobin III is a citizen
of the United States and a resident of New Castle County,
Delaware.  For over 28 years, he was employed as a police officer
for the municipal defendant.  He most recently held the rank of
Lieutenant.  He currently is the Chief of Police of the

Middletown Police Department.  At all times material hereto, he has been a diligent, honest and loyal employee who always performed his job in an exemplary manner.

4.    Defendant Thomas P. Gordon ("Gordon"), at all times material hereto, was the incumbent County Executive of defendant New Castle County (the "County").  He pleaded guilty to committing crimes while holding public office.  He is sued in his individual and official capacities for retaliatory actions which were taken against plaintiff.

5.    Defendant Sherry Freebery ("Freebery"), at all times material hereto, was either the Chief Administrative Officer of the County or the Colonel of its Police Department.  She pleaded guilty to committing crimes while holding public office.  She is sued in her individual and official capacities for retaliatory actions which were taken against plaintiff.

6.    Defendant John L. Cunningham ("Cunningham") was the Colonel and highest ranking officer of the County Police Department through June of 2003.  He pleaded guilty to committing crimes while holding public office.  He is sued in his individual capacity for retaliatory actions against plaintiff which were taken prior to his retirement.

7.    Defendant David F. McAllister ("McAllister") was the Colonel of the County Police Department from July 29, 2003 to October 19, 2005.  He is sued in both his individual and official

capacities for retaliatory actions which were taken against plaintiff while he was Colonel.

8.   Defendant New Castle County is a municipal corporation under the laws of the State of Delaware.

### III.   FACTS GIVING RISE TO THE ACTION

### A. GORDON AND FREEBERY'S TOTAL CONTROL OF THE POLICE DEPARTMENT

9.   At all times material hereto, Gordon and Freebery made all personnel and promotion decisions for the County Police Department, and otherwise whenever they wished exercised total control of the day to day operations of the Department.  They and the County also had a policy, custom and practice of retaliating against their opponents within the Police Department.

10.  For example, defendant Cunningham on December 16, 2003 plead guilty in Superior Court to the crime of conspiracy in the third degree, in violation of Title 11 section 511 of the Delaware Code.  Therein he admitted that during August 2002 he agreed with defendant Freebery that one or both of them would engage in the crime of official misconduct in violation of 11 Delaware Code section 1211(2).  To that end and out of fear of the personal consequences he would suffer at the hands of defendant Freebery, he pressured subordinate police officers to work during both working and non-working hours on the 2002 political campaigns of Patty Powell and William Tansey, two Council members of the County who defendants Gordon and Freebery

-4-

sought to control.

11.    In his written guilty plea, defendant Cunningham further admitted that he pressured police officers to work on the Powell and Tansey campaigns "because he was directed to do so by his boss ... Sherry L. Freebery, and because he reasonably feared that if he did not comply with Ms. Freebery's directive he would suffer consequences that would significantly and negatively affect his employment."

12.    As another example of Gordon and Freebery's total control over the operations of the Police Department, in retaliation for free speech on a matter of public concern, on or about June 12, 2001 Freebery also directed and caused a D.M., a County police officer, to violate the criminal law and access the classified DelJIS criminal records computer database to see if a citizen who had written a public letter critical of defendants Gordon and Freebery had a criminal record.

### B. THE 1996 ELECTION SCHEME

13.    To accomplish their criminal objectives, Gordon and Freebery sought to dominate, misuse, and control County government and to misuse the authority of their offices to create an atmosphere of intimidation so that Police Department employees and other County employees would comply with their orders, directions and requests, even if they were unlawful.  They also sought to misuse the authority of their offices to create an

atmosphere of intimidation so that Police Department employees,
and other County employees, would comply with their orders,
directions and requests, even if they were unlawful.

14.  To accomplish these ends, in the 1996 general election
Gordon sought to be elected as County Executive of New Castle
County so he could control the operations of County government
and the executive branch of government.

15.  In November of 1996, Freebery was the Colonel of the
Police Department.  As stated in a May 26, 2004, criminal
indictment filed by the United States against defendants Gordon
and Freebery for engaging in an election scheme, on or about
November 1, 1996, Freebery directed and caused J.H., a
subordinate County Police officer and classified employee, to
order County Police officers who were classified employees under
J.H.'s supervision to report to the headquarters of the Gordon
Campaign, during working hours, to make telephone calls for
political candidates, thereby causing such County police officers
to forgo executing a search warrant they were intending to
execute at that time.  (Indictment ¶ 13 A.).

16.  From about February 1996 to on or about August 23,
2002, Gordon and Freebery diverted and used County resources for
their personal benefit and caused County employees to use County
property, including computers and restricted computer databases,
photocopiers, paper, and buildings, to prepare campaign

literature, create and maintain campaign contribution and voter databases, and perform other related campaign or political services (Indictment ¶ 14), such as the following.

A.  From spring to November 1996 using a County Police computer to create and maintain records of financial contributions, (¶ 14. A.).

B.  Using a County Police computer to prepare political literature for the Gordon Campaign and also for Thomas Sharp, an incumbent and powerful State Senator from New Castle County, during working hours, (¶ 14. B.).

C.  Before November 1996 Freebery caused a subordinate police officer to illegally access the DelJIS database to determine whether a candidate running against Gordon had a criminal history, (¶ 14. C.).

D.  From July 11, 1994 through November 8, 1994 causing a subordinate County police officer to cause recruits under his command and who were attending the County's Police Academy, to "volunteer" their time off to perform political campaign activity, (¶ 15. A.).

E.  Promising an officer of F.O.P. Lodge No. 5, which represents County police officers, that he would receive a promotion if the Lodge would sponsor a billboard supporting the Gordon Campaign, (¶ 15 B.).

F.  On November 4, 1996 causing County police officers not to report for work, but instead to distribute campaign literature, and caused these officers to be charged for eight hours of vacation for performing such services,  (¶ 15. C.).

16a.  Defendant Gordon pleaded guilty to some of the charges discussed above.  In his written guilty plea, Gordon admitted that he illicitly caused two County executive assistants in his employ to work on and contribute to the political campaigns of both Powell and Tansey, all while they were being paid to perform work for the County.

16b.  Janet Smith was an executive assistant for the County who was criminally indicted along with defendants Gordon and Freebery.

16c.  After the indictments, she pleaded guilty to a crime that she committed while she held public office.

16d.  In her written guilty plea, she admitted that she was ordered by defendants Gordon and Freebery to work on the Powell and Tansey political campaigns while being paid for performing duties for the County.

16e.  Her guilty plea also admits that defendants Gordon and Freebery ordered her to direct additional executive assistants to work on these same political campaigns while on County time.

16f.  Her guilty plea further admits that eventually, more than 900 working hours and $30,000 in labor services were

-8-

illicitly directed to the Powell and Tansey campaigns.  Then, an additional $10,000 in vacation time was given as a reward to seven of the executive assistants who worked on these campaigns.

### C. PLAINTIFF'S PROTECTED SPEECH AND PETITION

### (1)  Meeting with Representatives of the U.S. Attorney's Office, the F.B.I. and the I.R.S.

17.   On October 18, 2002, during an ongoing federal criminal investigation into defendants' illegal behavior, plaintiff, in his private capacity as a concerned citizen, attended a meeting at a secret location with representatives of the U.S. Attorneys' Office, the Federal Bureau of Investigation ("F.B.I.") and the Internal Revenue Service ("I.R.S.").  At this meeting, plaintiff spoke to these representatives about defendants' illegal conduct.

### (2)  Grand Jury Testimony Under Federal Subpoena

18.   Plaintiff subsequently was served by the U.S. Attorney's Office with a subpoena, compelling him to testify before a federal grand jury investigating defendants' unlawful conduct.

19.   Plaintiff notified the individual defendants that he had been subpoenaed to testify before the federal grand jury by reporting it through the chain of command of the Police Department.

20.  On December 11, 2002, plaintiff, in his private
capacity as a concerned citizen, appeared before the federal
grand jury and testified truthfully when questioned by the U.S.
Attorney's Office about defendants' unlawful conduct.  The
defendants were angry and not pleased that he had done so.

**(3)  Follow up Phone Conversation with the F.B.I.**

21.  On February 3, 2003, the lead F.B.I. agent in the
federal investigation telephoned plaintiff.

22.  At that time, plaintiff gave the F.B.I. a supplemental
oral statement containing additional information and
clarification of his grand jury testimony of December 11, 2002.

23.  In sum, plaintiff, in his private capacity as a
concerned citizen, spoke out to the U.S. Attorney's Office, the
F.B.I. and the I.R.S., and likewise petitioned them for a redress
of grievances.

24.  Through his oral and/or recorded statements at the
secret meeting, in his grand jury testimony, and in the F.B.I.
phone call, plaintiff, in his private capacity as a concerned
citizen, exercised his First Amendment right to speak out on
matters of public concern and to petition government for a
redress of grievances.

25.  At all times, plaintiff, in his private capacity as a
concerned citizen, spoke out and petitioned on matters of public
concern under the First Amendment, specifically coverup of

criminal activity, breach of the public trust, election and campaign irregularities, improprieties, fraud and governmental corruption by defendants Gordon and Freebery and the need to correct these abuses.

26.  Plaintiff sought to bring to light actual or potential wrongdoing or breach of the public trust by Gordon and Freebery, and to have those wrongs exposed to the light of day and corrected by those with authority to do so.

**D.  THE CONTENT OF PLAINTIFF'S PROTECTED SPEECH AND PETITION**

**(1)  Illegal Use of On-Duty Police Officers in the 1996 Campaign**

27.  At the secret meeting, in his grand jury testimony, and in the F.B.I. phone call, plaintiff told the federal authorities that defendants engaged in election and campaign irregularities by illegally using on-duty New Castle County police officers to campaign in 1996.

28.  For example, Freebery, then Chief of Police, shut down the Police Department's Detective Division for an entire workday and forced a majority of all County detectives to participate in a literature drop.

29.  Gordon and Freebery led a "literature drop" at DelCastle Park on behalf of incumbent State Senator Thomas Sharp during his successful bid for re-election in 1996.

30.  At that time, defendants made plaintiff solicit twenty five "volunteers" from on duty County Police officers to campaign for defendant Gordon for County Executive.

31.  Defendants' actions were in clear violation of state law as set forth in 15 Del.C. § 8012(d) and 15 Del.C. § 8002(6)(f), which prohibit political subdivisions from contributing value and services to political campaigns.

32.  Defendants actions also were in violation of long-standing County policies and practices.

**(2)  The Hit-and-Run Accident Coverup for Freebery's Son**

33.  At the secret meeting, in his grand jury testimony, and during the F.B.I. phone call, plaintiff told federal authorities that defendants covered up the fact that Freebery's son, Patrick Duffy, was involved in a hit-and-run motor vehicle accident on Friday November 30, 2001, at 11:35 pm.

34.  Specifically, Freebery's son fled the scene of a hit-and-run accident and drove to the residence of his mother.

35.  Plaintiff was the Shift Commander of Patrol Squad E and he was on duty that night.

36.  The hit-and-run accident occurred on Yorklyn Road, approximately a half mile from its intersection with Route 41 in the vicinity of the NVF Plant.

37.  The motorist whose vehicle was struck pursued Duffy past the intersection before telephoning the police to report the hit-and-run accident and also Duffy's Delaware license tag number C3171.

38.  County police officers responded to the scene of the hit-and-run accident.

39.  The officers found pieces of broken glass from an automobile taillight lens and other debris characteristic of a motor vehicle accident.

40.  The officers also ran a computer check of the tag number.

41.  The computer check revealed that the fleeing vehicle, which was a 1998 Ford Expedition, was registered to Freebery and her son, Patrick Duffy, with an address located on Ramunno Circle, Hockessin, DE.

42.  Upon determining the ownership of the fleeing vehicle, the officers sought further instructions from plaintiff on how to proceed since Freebery owned the vehicle and she was the Chief Administrative Officer of the County.

43.  In response, plaintiff ordered the officers to uphold the law which treats all citizens equally, even if they are a high public official or a member of their family.  Refusing to grant any special favors, he ordered the officers to proceed as they would with any other hit-and-run accident investigation by

responding to the residence of the registered owners of the
fleeing vehicle and to determine whether the driver had been
drinking.

44.  Accordingly, the officers responded to Freebery's
residence on Ramunno Circle.

45.  Outside her residence, the officers found tire tracks
across her next-door neighbor's front lawn that led toward
Freebery's garage door where the vehicle was locked inside.

46.  Outside the garage in the driveway a County vehicle
with a warm hood was parked.  Its driver had obviously just
arrived and rushed inside the home.

47.  The officers knocked on Freebery's door, but no one
would answer.

48.  The officers then telephoned Freebery's residence, but
still no one answered, even though the hood was warm on the
County vehicle parked in the driveway.

49.  Inside Freebery's residence, all the lights were turned
off and there was no sign of anyone.

50.  No one answered the door or the phone.

51.  There was no search warrant or exigent circumstances to
justify a forced entry into the residence.

52.  So the officers then returned to the Minnquedale Police
Station to properly preserve and record the physical evidence,
such as the broken auto tail light lens which could be matched up

with the vehicle in Freebery's garage to which the police did not have access.

53.  The accident debris and physical evidence was secured in evidence in accord with departmental procedures.

54.  Defendant Cunningham had learned of the criminal investigation and he then ordered plaintiff via a Captain just to clear the scene of the accident and to do nothing further.

55.  Approximately four hours after the officers had left her home, and after it was too late to administer a reliable sobriety test on the driver of the vehicle, Freebery telephoned the plaintiff's office from her residence and spoke to plaintiff.

56.  She claimed that she had been asleep the whole time and when she awoke she found a message on her answering machine.

57.  Doing his duty, plaintiff then demanded to speak with her son, but she claimed that he was asleep and she refused to cooperate in the criminal investigation.

58.  Then in response to plaintiff's demand to have officers interview her son the following evening, she refused again and claimed that he had a date with his girlfriend.  She finally agreed that he would report to the police station on the second evening after the hit-and-run accident.

59.  But when that date arrived, Freebery's son telephoned the Police when plaintiff was not yet on duty, left a message, and claimed that he could not make it to the station that evening

and so they would have to re-schedule his interview.

60. Finally, after the trail was cold and any physical damage could have been secretly repaired, Freebery's son reported to the police station with the vehicle on the third evening after the hit-and-run accident.

61. The vehicle still had scuff marks consistent with the damage to the victim's vehicle. But the auto tail light lens was intact. But with the three day delay damage to the vehicle secretly could have been repaired.

62. Defendant Cunningham then ordered the criminal investigation terminated approximately one week after the hit-and-run accident and he left the hit-and-run victim to his civil law remedies.

63. Later, Duffy contacted the victim and offered to pay for the damage to the victim's vehicle.

64. No charges were ever brought against Freebery's son for the hit-and-run accident. He could have faced charges of leaving the scene of an accident, failure to report an accident, driving under the influence and even reckless driving.

65. By its content, form and context, at all times plaintiff, in his private capacity as a concerned citizen, spoke out about matters of public concern.

65a. None of plaintiff's speech was required by his job duties or responsibilities as a lieutenant in the New Castle

County Police Department.

**E.   THE NON—DISRUPTIVE NATURE OF PLAINTIFF'S SPEECH AND PETITION.**

66.  All of plaintiff's speech and petitioning was non–disruptive of any legitimate interest of his employer and was on matters of public concern to the County, as well as the General Assembly, the Governor of Delaware, the U.S. Attorney, the F.B.I., the I.R.S., New Castle County Council, the news media, voters and the public at large.  His speech and petitioning related to matters of political, social and other concern to the community.

67.  Plaintiff was acting in good faith and with honest motive at all times when he exercised his First Amendment rights to freedom of speech and to petition the government.  At all times, plaintiff believed that his speech was true.

68.  Plaintiff was not being disloyal by speaking out and petitioning the government.  Instead, he sought to bring to light blatant violations of the law.

69.  The public concern in and value to the community at large of being free to hear plaintiff's speech outweighs any asserted government interest in the effective and efficient provision of services.

70.  Nothing plaintiff said interfered with the regular operations of the Police Department.  Plaintiff's speech did not interfere with the Department's interests in: crime fighting;

fostering trust and confidence among officers; protecting the safety of officers or other members of the community.

71.  Plaintiff's speech did not threaten the authority of the Colonel to run the Department.  Nothing plaintiff said damaged his relationship with any superior officer.  Plaintiff did not impugn the integrity of his supervisors.

72.  Plaintiff's speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary.  Plaintiff is not the alter ego of defendants.  Organizationally, plaintiff is several ranks below in the chain of command.

73.  Any disruption that was caused was not caused by plaintiff's speech but was instead caused by the very problems that plaintiff's speech was in fact intended to address – illegal conduct.

74.  In his position as a lieutenant, plaintiff did not make or formulate County policy.  Rather, formulation of County policy is left up to others.

75.  The individual defendants were aware of plaintiff's protected speech and petition, described above, and it angered and antagonized them.

**F.  THE PROMOTIONS TO CAPTAIN**

76.  On March 3, 2003, the County announced that it was taking applications for two Police Captain positions.

-18-

77.   Plaintiff applied for those two positions.

78.   On March 17, 2003, the application period ended.

79.   The application process consisted of an oral board interview examination before three board members.

80.   Under County work rules, the board makes a recommendation to the Colonel based on its interviews of the candidates.

81.   Also under County work rules, the Colonel is then supposed to make the final decision regarding each promotion.

82.   In reality, defendants Gordon and Freeberry make all personnel and promotion decisions.

83.   Alternatively, Gordon ratifies, sanctions, approves, acquiesces in, permits, or authorizes Freebery's decision.

84.   Plaintiff presently is 52 years old and he was employed by the County as a police officer for over 28 years.

85.   He held a supervisory position since 1989, when he was promoted to Sergeant.

86.   In 1994 plaintiff was promoted to Lieutenant.

87.   In 1998 he was promoted to Senior Lieutenant.

88.   Plaintiff's annual performance review received on February 14, 2003, a mere month before his application, rated him as exceeds expectations in all but one category.

89.  His last annual performance review received on March 8, 2004, was outstanding and rated him as exceeds expectations in all categories.

90.  On March 18, 2003, plaintiff tested for the positions before the oral board.

91.  The board consisted of Major James R. Hedrick, then Captain Stuart Snyder, and Captain Debra Rees.

92.  Major Hedrick and Captain Snyder ranked plaintiff first for promotion to Captain.

93.  Overall, the board ranked plaintiff first for promotion to Captain.

94.  But on May 12, 2003, one promotion went to Lieutenant Quinton Watson, and another to Lieutenant Scott McLaren, who were lesser ranked candidates.

### G.  CIRCUMSTANTIAL EVIDENCE OF RETALIATORY MOTIVE

95.  But the County historically has promoted candidates in the order in which they ranked under the oral board testing.

96.  Previously on September 24, 2002, the two candidates who were ranked first by the oral board for promotions to Lieutenant and Sergeant respectively received those promotions.

97.  In fact, from 1996 to May 24, 2004, all candidates for promotion to Sergeant, Lieutenant, Captain, or other supervisory roles within the Police Department, who tested and were ranked first for a promotion, were promoted except for plaintiff.

98.   The board had only ranked Quinton Watson third overall for promotion to Captain and McLaren was only sixth.

99.   One of the requirements of promotion also was completion of some college courses in police science, business, administration, management, finance, or related field.

100.  Plaintiff has a Master's degree in Human Resources Management.

101.  But Watson does not even have a college degree.

102.  Under the County's current hiring guidelines regarding the number of college credits to be completed by applicants for employment, Watson would not even be eligible to be hired as a police officer.

103.  Watson and McLaren were less qualified than plaintiff for promotion to Captain.

104.  The County also violated its own rules regarding the time to commence oral board testing.

105.  Under its work rules, oral board testing for a promotion shall not begin until the application period ends.

106.  But the oral board testing for the position commenced before the application period ended.

107.  After plaintiff appeared before the Grand Jury in 2002, and also in 2003, defendants deliberately set upon a course of conduct designed to retaliate against plaintiff because of his speech and petition in an attempt to make his conditions

of employment so intolerable that he would be forced to resign. To this end defendants materially and adversely altered the terms and conditions of plaintiff's employment.

108.  In December of 2003, two additional Captain positions became vacant.

109.  But defendants froze the promotion list and did not post any vacancies for Captain between December of 2003, and March 19, 2004.  Defendants refused to seek applications for those two positions since plaintiff was still ranked first on the eligibility list.

110.  The list ranking plaintiff as the first candidate for promotion to Captain then expired on March 19, 2004.

111.  Just four days later, on March 23, 2004, defendants posted one of the two vacant Captain positions and declared that applications could be made for promotion.

112.  After plaintiff re-tested on April 29, 2004, defendants lowered plaintiff's ranking to fourth and failed to promote him to the vacant Captain position.

113.  Instead, on or about May 24, 2004, defendants promoted Elmer Setting to Captain, a clearly unqualified person to be a Captain.

114.  Setting previously was ranked last among the twelve candidates for promotion on the list for the May 2003 promotion. But in 2004 suspiciously he was ranked first.

115.   In a specific attempt to scare plaintiff into silence, defendants also transferred plaintiff to the Southern Patrol Unit's Headquarters in Middletown, Delaware on or about May 31, 2004.

116.   As a result of plaintiff's protected speech and petition, defendants retaliated against him in numerous ways.

A.   Plaintiff was denied promotion to Captain three times.

B.   Plaintiff was involuntarily transferred from the Minnquedale Station to a less desirable position at the Southern Patrol Unit's Headquarters in Middletown, Delaware, a career experience which plaintiff already had acquired in his two prior assignments there.

C.   Plaintiff's job responsibilities were altered because he no longer served as the Executive Officer to the Patrol Captain.

D.   Plaintiff, in effect, was demoted because he commanded approximately twenty five officers in Middletown compared to the approximately 200 officers he often commanded as Executive Officer to the Patrol Captain at Minnquedale.

117.   The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising his First Amendment rights to speech and petition.

118.   A reasonable person of ordinary firmness would be deterred from exercising his First Amendment rights to speech and petition when threatened with denial of three promotions to Captain; involuntary job transfer to a less desirable position; alteration of job responsibilities and an effective demotion.

**H.   THE CAUSAL LINK BETWEEN SPEECH, PETITION AND ADVERSE ACTION**

119.   There is a causal link between First Amendment protected activity on matters of public concern, or petition for the redress of grievances, and numerous adverse actions.

120.   Defendants were angered and antagonized by plaintiff's First Amendment protected activity.

121.   First Amendment protected activity was a substantial or motivating factor in defendants' failure to promote plaintiff. The natural probative force of the evidence demonstrates causation.

**I. PLAINTIFF'S INJURIES**

122.   Plaintiff has been shunned by his fellow police officers of equal, higher, and even lesser rank, who have questioned if there is something wrong with him as a police officer or if plaintiff engaged in improper conduct which would justify defendants' failure to promote him.

123.   Plaintiff also has been isolated from society as a result of defendants' retaliatory actions.  Plaintiff may never know the extent of his lost opportunities to relate and associate

-24-

with others because he can be avoided without knowing the reason
and without having a chance to explain the reason for the
retaliatory action taken against him.

124. As a direct and proximate result of the actions of the
defendants as detailed herein, plaintiff has or will suffer
lost or reduced wages and earnings, diminished earning capacity
now and upon his retirement, lost or reduced County pension and
benefits, including but not limited to lost clothing allowance,
professional time, shooting days, and other benefits of being a
Captain, decreased employment and earnings opportunities and
other pecuniary losses, emotional pain, suffering, anger,
disappointment, inconvenience, mental anguish, loss of enjoyment
of life, mental and physical pain, physical injury, anguish,
humiliation, embarrassment, injury to reputation and other
pecuniary and non-pecuniary losses and injuries.

IV. **ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT**

125. The individual defendants' actions violated clearly
established federal constitutional rights of which any reasonable
official would have known, including three decades of Third
Circuit and Supreme Court case law prohibiting retaliation
against public employees for protected speech.

126. At all times material hereto, the individual
defendants participated in, authorized, and sanctioned the
federal constitutional deprivations described above which

illegally retaliated against plaintiff.

127.  At all times material hereto, the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable to the State.

128.  The actions of the defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

129.  The defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

130.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

131.  Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

132.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to plaintiff.

133.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to plaintiff.

134.  The defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

135.  The individual defendants' actions were willful, reckless and oppressive.

136.  The defendants' actions were motivated by bias, bad faith, and improper motive.

137.  The defendants' actions constituted an abuse of governmental power.

138.  The defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

139.  The defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

140.  The actions of the defendants were taken pursuant to County policies, customs and/or practices and were authorized, sanctioned, implemented, permitted, and ratified by officials functioning at a policy making level.

141.  By the policy, custom, and/or practice of officials functioning at a policy making level, the defendants have retaliated against plaintiff.  That policy, custom and/or practice caused a deprivation of constitutional rights. Additionally, the defendants must have known, or reasonably should have realized, from the nature of their conduct that their

policy, custom and/or practice was causing or was likely to cause violations of federal constitutional rights.

## COUNT I (FREE SPEECH CLAUSE)

142.   Plaintiff repeats and re-alleges paragraphs 1-141 set forth above.

143.   The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected speech as a concerned citizen on matters of public concern.   There is a temporal and causal relationship between plaintiff's aforementioned protected speech, and adverse employment action.   First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

144.   Plaintiff's constitutional right to freedom of speech under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983 has been denied.

## COUNT II (PETITION CLAUSE)

145.   Plaintiff repeats and re-alleges paragraphs 1-144 set forth above.

146.   The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiff's First Amendment protected petitions for the redress of grievances.   There is a temporal and causal relationship between plaintiff's aforementioned protected petition and adverse

-28-

employment action.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.

147.  Plaintiff's constitutional right to petition government for the redress of grievances under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983 has been denied.

**WHEREFORE**, plaintiff prays that the Court:

(A)  Enter judgment against the individual defendants, jointly and severally.

(B)  Enter a declaratory judgment declaring the acts of the defendants to be a violation of plaintiff's constitutional rights.

(C)  Enter a judgment against the defendants, jointly and severally, for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation, embarrassment, and injury to reputation.

(D)  Enter separate judgments against the defendants for punitive damages.

(E)  Issue a reparative injunction directing that plaintiff's pension and other benefits be calculated as if he had been promoted to the rank of captain as of May 12, 2003.

(F)  Issue a mandatory injunction ending the continuing illegal actions of defendants Gordon and Freebery, and their agents, and barring them from interfering or participating in any way whatsoever in the promotion or transfer process of the County Police Department.

(G)  Issue a reparative injunction directing that the individual defendants place a signed document in plaintiff's personnel file indicating that he was qualified to be promoted to the rank of Captain, effective May 12, 2003, and that but for illegal conduct by each defendant he would have been promoted to that rank on at least one other occasion since that date, and apologizing to plaintiff for violating his constitutional rights.

(H)  Enjoin the defendants from retaliating against plaintiff.

(I)  Award plaintiff attorneys' fees, costs and pre and post judgment interest for this action.

(J)  Require such other and further relief as the Court

deems just and proper under the circumstances.


**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street
Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com


**LAW OFFICE OF JOHN M. LaROSA**

/s/ John M. LaRosa
**JOHN M. LaROSA, ESQUIRE (#4275)**
Two East 7th Street
Suite 302
Wilmington, Delaware 19801-3707
(302) 888-1290
JLR@LaRosaLaw.com


Attorneys for Plaintiff


Dated: July 24, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CHIEF HENRY V. TOBIN III,          :
                                   :
          Plaintiff,               :
                                   :    C.A. No. 04—1211 ***
          v.                       :
                                   :
THOMAS P. GORDON, individually:
and in his official capacity; :
SHERRY FREEBERY, individually :
and in her official capacity; :
COLONEL JOHN L. CUNNINGHAM,        :
RETIRED, individually;            :
COLONEL DAVID F. MCALLISTER,      :
individually and in his           :
official capacity; and            :
NEW CASTLE COUNTY,                :
a municipal corporation,          :
                                   :
          Defendants.             :

<u>CERTIFICATE OF SERVICE</u>

I, John M. LaRosa, being a member of the Bar of this Court, certify that on this 24th day of July 2007, I electronically filed this First Amended Complaint with the Clerk of this Court using CM/ECF which will send notification of such filing to the following:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
William W. Bowser, Esquire
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

Attorneys for Defendants
Colonel David McAllister and New Castle County

Charles E. Butler, Esquire
1224 North King Street
Wilmington, DE 19801

Attorney for Defendants Sherry L. Freebery and Thomas P. Gordon

OBERLY JENNINGS & RHODUNDA, P.A.
Kathleen M. Jennings-Hostetter, Esquire
Karen V. Sullivan, Esquire
800 Delaware Avenue, Suite 901
Wilmington, DE 19801

Attorneys for Defendant John L. Cunningham


                        /s/ John M. LaRosa
                        **JOHN M. LaROSA, ESQUIRE (#4275)**

cc:  Thomas S. Neuberger, Esquire
     Stephen J. Neuberger, Esquire
     Chief Henry V. Tobin III (via U.S. mail)


Tobin, Henry/Pleadings/First Amended Complaint-Final

ii